ANDRÉ BIROTTE JR.
United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division
SEKRET T. SNEED (State Bar No. 217193)
Assistant United States Attorney
     Federal Building, Suite 7516
     300 North Los Angeles Street
     Los Angeles, California 90012
     Telephone:   (213) 894-3551
     Facsimile:   (213) 894-7819
     E-mail:     sekret.sneed@usdoj.gov

Attorneys for Defendant
JANET NAPOLITANO, as Secretary of the
Department of Homeland Security

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| FRANK JOSEPH CARDERELLA,<br><br>     Plaintiff,<br><br>     v.<br><br>JANET NAPOLITANO, as Secretary of the Department of Homeland Security,<br><br>     Defendant. | No. CV09-8299 R (MANx)<br><br>DECLARATION OF AUSA SEKRET T. SNEED IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION<br><br>Date: September 20, 2010<br>Time: 10:00 a.m.<br>Ctrm: Spring Street Courthouse<br>     255 East Temple Street, Ctrm 8<br>     Los Angeles, California 90012<br><br>[Fed. R. Civ. Proc. 56; Local Rule 56-1]<br><br>Honorable Manuel L. Real |

1    I, Sekret T. Sneed, declare as follows:

2        1.      I am an Assistant United States Attorney for the Central District of

3    California.  In the United States Attorney's Office, I have been assigned primary

4    responsibility for representing defendant Janet Napolitano, in her official capacity as

5    Secretary of Department of Homeland Security ("Defendant"), in this action.  I have

6    personal knowledge of the matters contained herein, or I have obtained such

7    knowledge from my review of official files and records of the United States Attorney's

8    Office for the Central District of California and the Department of Homeland Security-

9    Immigration and Customs Enforcement, and if called as a witness, I could and would

10   testify competently thereto.

11       2.      Attached hereto as Exhibit A are true and correct copies of excerpts from

12   the deposition of plaintiff Frank Joseph Carderella taken on July 21, 2010.

13       3.      Attached hereto as Exhibit B is a true and correct copy of the Immigration

14   and Naturalization Service ("INS") Workforce Profile Summary as of March 31, 1997,

15   from the Report of Investigation submitted to INS on December 14, 1998, which

16   Plaintiff admitted was genuine in his Responses to Defendant's First Set of Request for

17   Admission.

18       I declare under penalty of perjury under the laws of the United States of America

19   that the foregoing is true and correct and that this declaration was executed this 17th

20   day of August 2010.

21

22                          /s/

23                          _____
                            SEKRET T. SNEED

24

25

26

27

28

1

# EXHIBIT A

CERTIFIED COPY

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

FRANK JOSEPH CARDERELLA,    )
                               )
        Plaintiff,       )
                               )
        vs.            )   CASE NO.: CV09-8299 R(MANx)
                               )
JANET NAPOLITANO, as       )
Secretary of the Department   )
of Homeland Security,      )
                               )
        Defendant.     )
                               )

### <u>DEPOSITION OF FRANK JOSEPH CARDERELLA</u>
### LOS ANGELES, CALIFORNIA
### WEDNESDAY, JULY 21, 2010



THE HUNTINGTON BUILDING, SUITE 100
1450 WEST COLORADO BLVD.
PASADENA, CA 91105
GSA APPROVED VENDOR-GS-07F-0169V
626/792-6777
FAX 626/7n92-8760
E-Mail : reports@huntingtocr.com
Website: http://www.huntingtoncr.com

REPORTED BY:
TRULY A. VOSBERG

CSR NO.: 12656

1            UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4

5   FRANK JOSEPH CARDERELLA,    )
                         )
6        Plaintiff,      )
                         )
7        vs.            ) CASE NO.: CV09-8299 R(MANx)
                         )
8   JANET NAPOLITANO, as     )
   Secretary of the Department )
9   of Homeland Security,     )
                         )
10       Defendant.      )
    _____)
11

12

13

14

15

16     Deposition of FRANK JOSEPH CARDERELLA, taken on

17  behalf of Defendant, at 300 North Los Angeles Street,

18  Room 7516, Los Angeles, California, commencing at 10:03

19  A.M., Wednesday, July 21, 2010, before TRULY A. VOSBERG,

20  CSR No. 12656, pursuant to NOTICE.

21

22

23

24

25

FRANK JOSEPH CARDERELLA JULY 21, 2010

```
 1                    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4    GOOD, WILDMAN, HEGNESS & WALLEY
      5000 Campus Drive
 5    Newport Beach, California  92660-2181
      949/955-1100
 6    BY:  JOHN A. STILLMAN, ESQUIRE

 7

 8    FOR THE DEFENDANT:

 9    U.S. DEPARTMENT OF JUSTICE
      UNITED STATES ATTORNEY'S OFFICE
10    300 North Los Angeles Street
      Room 7516
11    Los Angeles, California  90012
      213/894-3551
12    BY:  SEKRET T. SNEED, ASSISTANT U.S. ATTORNEY

13

14

15

16

17

18

19

20    ALSO PRESENT:

21    JOSH MELTZER

22

23

24

25
```

FRANK JOSEPH CARDERELLA JULY 21, 2010

1    A    To take a promotion.

2    Q    Was this a covered position?  Do you understand

3    what I mean by covered?

4    A    Yes, I do.

5    Q    Was this a covered position?

6    A    Yes, it was.

7    Q    Where were you promoted to?

8    A    Promoted in-house to case manager.

9    Q    What was your annual salary in that job?

10   A    I want to say that we were probably around

11   60,000 maybe to start, 60 to 70.

12   Q    And you were in the case manager position from

13   February '93 to March '96; is that right?

14   A    Yes.

15   Q    And did your salary increase during that time?

16   A    Yes.

17   Q    About what did it increase to?

18   A    I want to say maybe 10 to 15,000.  I can't

19   remember exactly.

20   Q    It went around to 80,000, 90,000?

21   A    Not quite that high.  It probably stayed around

22   the 75,000 mark, somewhere around there.  70 to 75,000.

23   Q    And was this a covered position?

24   A    Yes, it was.

25   Q    You eventually left the case manager position,

FRANK JOSEPH CARDERELLA JULY 21, 2010

1    A    I don't know if I still have a copy.  I'd have

2  to dig at home to see if I still have it.

3    Q    And since Mr. Graber and Mr. Gassoway and some

4  of the other individuals were with you, they also

5  submitted applications for this position?

6         MR. STILLMAN:  Calls for speculation.

7         THE WITNESS:  I believe, yes, they also

8  submitted applications.

9    Q    BY MS. SNEED:  Did you see them hand an

10  application to the personnel officer?

11    A    Yes.

12    Q    After you submitted your application for the

13  detention enforcement officer in November '95, what

14  happened next in terms of hearing about the job?

15    A    I received -- while I was in the academy in

16  Charleston, South Carolina, I had a telephonic interview.

17    Q    Do you remember around when this happened?

18    A    I want to say around April or May of that year,

19  1996.

20    Q    Did anyone contact you to set up the interview?

21    A    The only person that contacted me was one of the

22  representatives there for the academy that said, We're

23  going to set you up in a room to do a telephonic

24  interview, if you're still interested in this position.

25    Q    Was that the first you heard that you were going

FRANK JOSEPH CARDERELLA JULY 21, 2010

```
 1   to have an interview, when somebody at the academy

 2   approached you?

 3        A    Yes.

 4        Q    So you then went to this room on a certain date

 5   and had the interview; is that correct?

 6        A    Yes.

 7        Q    And it was over the telephone?

 8        A    Yes.

 9        Q    Do you remember who the interviewers were?

10        A    One was Ralph Roldan; and the other person, I

11   believe her name is Denise -- I can't remember Denise's

12   last name right off the top.

13        Q    Does Weaver-Lopez sound familiar?

14        A    It could be Denise Weaver.

15        Q    About how long did the telephone interview last?

16        A    I want to say a half hour to 45 minutes.

17        Q    Was it an instructor at the Charleston, South

18   Carolina, academy who approached you?

19        A    It could be.  I don't remember specifically who

20   it was, but they told me about the interview.

21        Q    And you said the individual said something along

22   the lines, if you're still interested; is that correct?

23        A    Right.

24        Q    And what did you say in response to that, if you

25   remember?
```

FRANK JOSEPH CARDERELLA JULY 21, 2010

```
 1        A     I said, Absolutely.

 2        Q     During that telephonic interview, do you

 3   remember what was said?

 4        A     Basically going over my background up to that

 5   point, the time that I'd had in with the government, just

 6   basic questions.  And the fact that, you know, I was

 7   completing IOBTC.

 8        Q     That's the -- what are those initials again?

 9        A     It's Immigration Officer's Basic Training

10   Course, which is what you need to become a deportation

11   officer, oddly enough.

12        Q     And what did they say to you, if anything, about

13   the job?

14             MR. STILLMAN:  Objection.  Ambiguous; overbroad.

15   He can answer it, if he understands it.

16        Q     BY MS. SNEED:  I'll rephrase it.

17             Did they tell you anything about what the job

18   would entail?

19        A     Uh-huh.

20        Q     What did they say?

21             MR. STILLMAN:  Yes?

22             THE WITNESS:  Oh, yes, yes.

23             MS. SNEED:  I'm glad you're paying attention.

24             THE WITNESS:  Basically they explained what the

25   job entitled and if I was aware of what I would be doing,
```

FRANK JOSEPH CARDERELLA JULY 21, 2010

1   and comparing that to my prior background and what I was

2   doing as an inspector and that sort of thing.

3        And I said, Yes, I'm well aware of what this job

4   entitles (sic).  And the reason why I'm applying for this

5   job in the first place, I explained to them because it

6   was a covered position, I'm attempting to get back home

7   to Los Angeles, and I eventually want to become a

8   deportation officer.  And that was pretty much everything

9   in a nutshell.

10       Q    At that point during the telephonic interview,

11  you were a GS --

12       A    7.

13       Q    -- 7.  And the detention enforcement officer

14  position was also a GS-7?

15       A    I don't know if at that point it might have been

16  an entry level 6.  I don't remember exactly.  But it was

17  either 6 or 7.

18       Q    Did you talk about the GS levels at all with

19  Mr. Roldan or Ms. Weaver?

20       A    I don't recall that.  We may have.  I don't -- I

21  don't know.

22       Q    Is there anything else you remember from the

23  phone call?

24       A    No.  I mean, just the willingness to take this

25  entry-level position, but I just explained to them my

FRANK JOSEPH CARDERELLA JULY 21, 2010

1    motive behind it.  And basically after having

2    completed -- I was in the process of already completing

3    the basic academy that you needed to become a deportation

4    officer.  So I was willing to -- like I said, two reasons

5    basically:  For the promotion aspect later on, and to get

6    away from the border and back to Los Angeles where I was

7    still living.

8         Q    How did the call end?  I'll rephrase it.

9              What did Ms. Weaver and Mr. Roldan say to you

10   about when you would hear about the results of the

11   interview?

12        A    I don't recall anything to that.  They didn't

13   give me any time frames or anything.  They just asked me

14   if I had any more questions, and we ended it there.  It

15   was -- that was it.

16        Q    Did you get any sort of sense from them if you

17   had done well in the interview?

18        A    Yes, I did.

19        Q    What gave you that sense?

20        A    I think Mr. Roldan pretty much said it.  Just

21   looking at my background, and that he felt that I was

22   overly qualified for this position.

23        Q    Did either Mr. Roldan or Ms. Weaver -- or Denise

24   give you an offer for the position?

25        A    No, no.  No, they didn't.

FRANK JOSEPH CARDERELLA JULY 21, 2010

1    Q    Did you believe that you would get the position

2    of the detention enforcement officer?

3    A    Yes, I did.

4    Q    Why did you believe that?

5    A    Because for an entry-level position, and already

6    knowing what I had completed with the government, GS

7    level, education, taking various things into

8    consideration, you're basically competing for a -- it's

9    not the same as competing as a deportation officer for a

10   supervisory deportation officer.  It's like a deportation

11   officer competing for an immigration enforcement officer

12   position.  It's like taking a step backwards.

13        Kind of like have you ever heard the statement,

14   you have to take a step backward before you can go

15   forward?  So -- but I felt confident because I knew a lot

16   of the people that were competing for this position, and

17   I knew their backgrounds.

18   Q    How many people did you know that were competing

19   for the position?

20   A    Well, they hired, I think, at least 25 people.

21   Q    What do you base that on?  How do you know that

22   they hired 25 people?

23   A    That's what personnel told me.

24   Q    When you submitted your résumé -- your

25   application?

FRANK JOSEPH CARDERELLA JULY 21, 2010

1    A    SF 171, they said at that time there were at

2    least 25 openings.

3    Q    So I think I interrupted you.  You were saying

4    that there were at least 25 positions.

5    A    That's what they were -- whether it was that

6    exact number, I don't know if it turned out that, but

7    that's what they said originally, that they were trying

8    to take on at least 25 people.

9    Q    And did you know any of the other people that

10   were applying for the 25 spots?

11   A    At that time, apart from the people that I was

12   working with at the BOP, no.

13   Q    And of the people at the BOP who you went to

14   the -- I'm assuming you're talking about the people at

15   the BOP who you went to the personnel office with?

16   A    Yes.

17   Q    How many people total went to the personnel

18   office to submit their applications?

19   A    I think there were just two of us, two or three

20   of us.

21   Q    You, Mr. Gassoway, and Mr. Graber?

22   A    Yes.

23   Q    What were the -- what's the background of

24   Mr. Gassoway?  Let me rephrase that.

25        How did you know that your qualifications were

FRANK JOSEPH CARDERELLA JULY 21, 2010

```
 1    superior to his?

 2         A    To Mr. Gassoway's?

 3         Q    Yes.

 4              MR. STILLMAN:  I don't know if he ever said

 5    that.

 6              MS. SNEED:  Let me back up.

 7         Q    BY MS. SNEED:  There were 25 openings for this

 8    position.  That's what you were told, correct?

 9         A    Yes.

10         Q    And besides yourself, you were aware of two

11    other people who applied for the job?

12         A    Yes.

13         Q    And I believe my original question was did you

14    believe that you would be selected, and you said yes.

15         A    Yes.

16         Q    Because you knew the other people who had

17    applied, correct?

18         A    Yes.

19         Q    So the only other people you knew who had

20    applied were Mr. Gassoway and Mr. Graber, correct?

21         A    But let me rephrase that.

22              I knew at the time of the interview that I would

23    be because at that point in time, you would not find

24    anybody -- and I'll go so far as to say this -- you

25    wouldn't find anybody in the L.A. office that had just
```

FRANK JOSEPH CARDERELLA JULY 21, 2010

1    completed the IOBTC and my background with the

2    government.  And if you -- I'll leave it at that.

3        Q    Was the vacancy, the 25 positions for the

4    detention enforcement officer, limited to the L.A.

5    office?

6        A    I don't know.

7        Q    Was there anything in the vacancy that said only

8    employees in the L.A. office could apply for this

9    position?

10       A    I don't -- I wouldn't know.

11       Q    Did you know Mr. Graber's -- what his

12   qualifications would have been for the detention

13   enforcement officer?

14       A    Yes, I think from working with him at the Bureau

15   of Prisons, yeah.

16       Q    What were his -- and you believed your

17   qualifications were equal to or superior to his?

18       A    Uh-huh.

19            MR. STILLMAN:  Yes?

20            THE WITNESS:  I'm sorry, yes.

21       Q    BY MS. SNEED:  What about Mr. Gassoway?

22       A    Yes.

23       Q    Your qualifications were equal to or superior to

24   his?

25       A    Yes.

1   was above you; is that correct?

2        A    No.

3        Q    No?  What was your GS level at the BOP when you

4   were a case manager?

5        A    11.

6        Q    After you had your telephonic interview in March

7   '96, I believe -- or April or May '96, excuse me, did you

8   talk to either Mr. Graber or Mr. Gassoway?

9        A    No.

10       Q    Did you ever talk to either individual about the

11  position after the three of you applied?

12       A    No, no.

13       Q    And eventually you came to learn that you had

14  not been selected for the detention enforcement officer

15  position, correct?

16       A    Yes.

17       Q    Do you remember around when you found that out?

18       A    I want to say either September or October of

19  '96.

20       Q    How did you learn you had not been selected?

21       A    I inquired through the personnel office here.

22       Q    You spoke to an individual?

23       A    Yes.

24       Q    Do you remember who that was?

25       A    No, I don't.

FRANK JOSEPH CARDERELLA JULY 21, 2010

1      Q     And what did this person tell you?

2      A     Basically that I didn't -- I was not selected.

3      Q     Did the two of you talk about anything else?

4      A     I had asked her why I didn't receive any

5   notification in the mail or anything, or how come no one

6   had contacted me.

7      Q     And what did he or she say?

8      A     She says that, We don't always do that.  We

9   don't always make it a point to let the applicants know.

10     Q     Did she tell you when the decision had been

11  made?

12     A     No.

13     Q     Did you ever find out when the decision for your

14  non selection had been made?

15     A     No, I never did.

16     Q     Was it just the two of you, you and the person

17  in the personnel office, at this conversation?

18     A     Uh-huh -- yes.

19     Q     Did you ask her anything about who had been

20  hired for that position?

21     A     No.

22     Q     And at the time you found out about the non

23  selection, you were an immigration inspector, correct?

24     A     Yes.

25     Q     While you were an immigration inspector, were

FRANK JOSEPH CARDERELLA JULY 21, 2010

1      Q      While you were a case manager?

2      A      Yes.

3      Q      When did you apply for the immigration inspector

4   position?

5      A      Sometime during 1995.

6      Q      After you found out that you had not been

7   selected for the detention enforcement officer position,

8   what did you do?

9      A      I talked to an EEO representative, counselor.

10      Q      How long after you had found out?

11      A      Shortly after.  I don't remember exactly, but it

12   was -- I think it was within the 45-day time frame that

13   they give us.

14      Q      Do you remember the EEO counselor's name?

15      A      He was a border patrol agent working down at San

16   Ysidro, and I don't remember right off the top of my head

17   now.

18      Q      What did you tell the EEO counselor?

19      A      Basically that I wanted to file a discrimination

20   complaint based on non selection.

21      Q      How do you think you've been discriminated

22   against?  What did you tell the EEO counselor that were

23   the reasons you were discriminated against?

24      A      Well, I thought based on my qualifications and

25   the fact of the hiring practices that I was aware of that

```
 1              looked (sic) during the selection
 2              process and discriminated against in
 3              the following categories:  Race
 4              (white) religion (Catholic); sex
 5              (male); national origin (Italian); and
 6              other (experience/qualifications).
 7              What facts do you have that would support your
 8    feeling that you were deliberately overlooked?
 9        A    The facts that I would have would basically be
10    in comparison to everyone's applications, the
11    information, I guess, that existed -- or the hearsay,
12    however you want to put it -- going around the office of
13    who submitted applications through who, whatever person.
14    The selection process that the people doing the selecting
15    in Los Angeles at that time that were responsible for
16    making the selections and the reputations that were going
17    around with these individuals as well.
18        Q    You said -- I believe the first thing you said
19    was everyone's application?
20        A    The individuals that were eventually selected, I
21    guess I should say.
22        Q    Did you ever find out what was on the
23    applications of all the individuals that were selected
24    for the DEO position?
25        A    No, I didn't.
```

FRANK JOSEPH CARDERELLA JULY 21, 2010

1    Q    You never saw anyone's application; is that

2  correct?

3    A    No, I didn't.

4    Q    No, you did not see anyone's application?

5    A    No, I did not see any applications.

6    Q    And you said the reputations of the individuals

7  making the decisions.  I may be paraphrasing a little

8  bit.  Who specifically are you talking about?

9    A    Whoever was within the upper echelon at that

10  time in Los Angeles.

11    Q    Do you remember their names?

12    A    No, not exactly.  I mean, I don't know who

13  exactly was responsible for the hiring at that point, if

14  it was the district director, the assistant.

15    Q    And you said their reputations.  What were their

16  reputations?

17    A    Unfortunately, our office has a bad reputation

18  to this day of their hiring practices.

19    Q    But it sounded like you specifically were

20  talking about specific individuals' reputations.  Is that

21  correct?

22    A    The individuals that were -- like I said, the

23  upper echelon at that time period.  I don't know who

24  specifically was responsible for making the decision on

25  this particular announcement.  Sometimes it may be the

FRANK JOSEPH CARDERELLA JULY 21, 2010

1    assistant field office director; sometimes it could be

2    someone else.  I don't know specifically.

3        Q    What was the reputation?

4        A    Of hiring based on who they know.

5        Q    But you don't know who hired -- who was the

6    deciding official for the DEO position that you applied

7    for, correct?

8        A    No, only speculation.

9        Q    Who do you think was responsible for the -- for

10   your specific non selection for the DEO position?

11       A    Who do I think?

12       Q    Yes.

13       A    Could have been Beverly Wilson.

14       Q    And had you ever met Beverly Wilson?

15            MR. STILLMAN:  As of that time?

16            MS. SNEED:  Yes.

17            THE WITNESS:  No.

18       Q    BY MS. SNEED:  Have you met Ms. Wilson at any

19   time?

20       A    Uh-huh, before she retired.

21       Q    When did you first meet Ms. Wilson?

22       A    I don't remember.

23       Q    Do you remember what position you held at that

24   point or where you were stationed?

25       A    It had to have been when I was at San Pedro

1    after 1997.

2        Q    And when you speak about the reputation of the

3    L.A. field office, are you referring to the reputation

4    then when you were applying for and not selected for the

5    DEO position, or now?

6        A    Unfortunately, this has been an ongoing thing.

7    This is something that -- I mean, if we took a poll right

8    now with everyone, you would not want to hear what, I'm

9    sure, what most people have to say about the reputation

10   for hiring people and promotions within the office.  It's

11   widely known and disturbing, and it continues to this

12   day.  I've seen it happen again recently.  I mean, it's

13   embarrassing.

14       Q    Had you heard anything specifically about

15   Ms. Wilson's reputation?  And I'm talking about when you

16   were talking to individuals about who had been selected

17   for the DEO position.

18       A    Yes, I have.

19       Q    What did you hear about her reputation?

20       A    It's embarrassing.  Having the habit of hiring

21   people that they know.

22       Q    Do you know if Ms. Wilson knew any of the

23   individuals that were selected for the DEO position that

24   you applied for?

25       A    No, I don't.

FRANK JOSEPH CARDERELLA JULY 21, 2010

1    eventually hired as DEO?

2        A    Not just them.  It goes around.  It's widely

3    known.  Like I said, I could take you out right now and

4    we could talk to a number of individuals right here on

5    the seventh floor about people that were just recently

6    hired.  I mean, it's widely known.  It's not something

7    that you think somebody would go out of their way to keep

8    quiet about.

9        Q    But as far as you know, for the specific DEO

10   vacancy that you applied for, that didn't happen?

11       A    I'm saying it did happen.

12       Q    I'm sorry, I misstated your testimony.  As far

13   as you know, you have no information that proves that's

14   what happened with the individuals who eventually were

15   hired as DEOs?

16       A    I don't think if I went up to one of the

17   supervisors at San Pedro at that time and said, Hey, did

18   you pull this individual in because you know them?  I

19   don't think they would come back and say, Yes, I did; I

20   recommended them over you.

21           MS. SNEED:  Could you read back my question

22   before his response, please.

23       (The last question was read by the reporter.)

24       Q    BY MS. SNEED:  Do you have any information that

25   any supervisors or anyone else spoke to Ms. Wilson about

FRANK JOSEPH CARDERELLA JULY 21, 2010

1   hiring individuals for the DEO position that you applied

2   for?

3       A    No, not --

4            MR. STILLMAN:  Asked and answered.  But he can

5   answer it again.

6            THE WITNESS:  No, I don't.  I don't

7   specifically.

8       Q    BY MS. SNEED:  And I believe you said you

9   never -- the first time you met Ms. Wilson was in '97,

10  correct?

11           MR. STILLMAN:  No, he said it was after.

12           THE WITNESS:  It would have been after 1997.

13      Q    BY MS. SNEED:  And what leads you to believe

14  that Ms. Wilson was the deciding official for the DEO

15  vacancies that you applied for?

16      A    I only believe -- I can only believe at that

17  time I think she had a lot to do with the hiring.  I

18  don't know specifically if she was in on every

19  announcement, selection process.  I don't know if she's

20  involved with all of them.  That's why I said originally

21  if she was the one who specifically did the hiring.

22      Q    Do you think that she did the -- that she may

23  have been the deciding official because of her position

24  at the time?

25      A    She could have been, uh-huh.  I don't know.  I

1   don't know if she was the deciding official or not.

2        Q     Now strictly speaking about the time period

3   between when you applied for the DEO position and when

4   you found out you weren't selected, do you have any

5   information that Ms. Wilson knew you were white?

6        A     No.

7        Q     Same period, do you have any information that

8   Ms. Wilson knew you were Catholic?

9        A     Let me rephrase that now.  Are you talking --

10  this is after the interview?

11       Q     Yes, strictly from the time you first applied

12  for the DEO position to when you found out you weren't

13  selected.

14       A     Sure -- well, if she was the selecting official,

15  sure she would.  She was -- she would have had to have

16  reviewed my application to see -- hopefully she reviewed

17  my application, whoever reviewed it would know my

18  background.

19       Q     Was there somewhere on the application for the

20  DEO position that asked you your race?

21       A     I don't remember back in the day, but the 171

22  form, it might have been.

23       Q     What's the 171 form?

24       A     That's the old government application.  They

25  used to call it the GS-171 -- I'm sorry, SF-171.

FRANK JOSEPH CARDERELLA JULY 21, 2010

1    Q    And at least in Exhibit 4, you believe the

2  reasons they didn't hire you was for race, national

3  origin, religion, and gender.

4          MR. STILLMAN:  And/or.

5          MS. SNEED:  And/or gender.

6    Q    BY MS. SNEED:  So what leads you to believe

7  that?

8    A    Well, in addition to that at this point in

9  trying to determine how they would know -- in regards to

10  talking about the application and knowing is there

11  anything pertaining to race, origin, you know, sex, if

12  they didn't know my background at that point after

13  already being employed with the agency, there must be

14  something missing here, especially since I just finished

15  the academy.  I find it hard to know they didn't know

16  everything about my background.

17    Q    At the time of the interview, you were -- you

18  had just joined INS, correct?

19    A    No.  I had just completed the academy.

20    Q    Well, you started as an immigration inspector in

21  March '96, correct?

22    A    Yes, I did.

23    Q    And the telephonic interview was April, May '96,

24  correct?

25    A    Somewhere around that time period.

FRANK JOSEPH CARDERELLA JULY 21, 2010

1   quotas -- it was more important to meet quotas than it

2   was to hire the best qualified applicant type of thing.

3       Q    And by quotas, quotas of what types of people?

4       A    Just basically a different -- different ethnic

5   groups.

6       Q    And when you say it was going around, was this

7   an official statement that was put out by INS?

8       A    No.

9       Q    So going around, this was office gossip?

10      A    Gossip based on facts.  I think if you break

11  down and you probably go down and look at how many

12  people, just go back over the hiring to see who exactly

13  had been hired, and you break down their backgrounds.

14      Q    What backgrounds do you think were hired under

15  the policy to maintain fairness to different groups?

16      A    Oh, I don't know.  That would just be

17  speculation.  I think it's safe to say that the majority

18  of the people in this agency are probably Hispanic or

19  black.  I don't know exactly, but there's a great

20  majority of Hispanics working in Los Angeles.

21      Q    So is that what you're referring to by specific

22  groups of people, Latinos?

23      A    No, no one specifically.  I'm not going to go

24  that far as to say anyone specifically, but it's just a

25  known fact that if you look at it and break it down of

FRANK JOSEPH CARDERELLA JULY 21, 2010

1    who is working here, the majority is Hispanic.

2       Q    I'm just looking at what you wrote here -- you

3    probably didn't write it, but what's in your affidavit.

4    And according to your affidavit, you weren't selected

5    because you believe the agency wanted to hire specific

6    groups of people; is that correct?

7       A    I just think that these specific groups of

8    people just happen to fall into certain categories of

9    Hispanic or people that they -- that just happened to be

10   at that spot at that time that they were pulling in.  It

11   wouldn't have mattered basically if they were Hispanic or

12   black.  The favoritism is just knowing the person, and if

13   they just happen to be Hispanic then they were Hispanic.

14   But I don't know the break down of these individuals that

15   were hired because they wouldn't give that information

16   out.  I could only go by what I saw later on as far as

17   the DEOs that were working in Los Angeles.

18          MS. SNEED:  Could you read my question, please?

19       (The last question was read by the reporter.)

20       Q    BY MS. SNEED:  I don't believe your answer quite

21   responded to that question.  So I'll ask it again.

22          Do you need the court reporter to read it again?

23       A    I don't think it's a matter we're saying what

24   the agency wants.  I think it's based on what some

25   individuals here in Los Angeles were doing as far as who

FRANK JOSEPH CARDERELLA JULY 21, 2010

1   page?

2        A     It appears to be my signature.

3              MR. STILLMAN:   On page 2?

4              MS. SNEED:   On page 2, yes.

5        Q     BY MS. SNEED:   And are those your initials on

6   the bottom right of the first and second pages?

7        A     Yes, they appear to be.

8        Q     And if you look at the second page, the full

9   question and answer on the second page, could you read

10  those to yourself and let me know when you're finished.

11       A     Uh-huh.

12       Q     And if you see in the middle of the last

13  paragraph that's the answer, it's marked with an A, it

14  says, quote:

15             They were hiring GS-5 Correctional

16             Officers and people off the street

17             over me and Lt. Gassoway, end quote.

18             Do you know who the specific GS-5 correctional

19  officers were?

20       A     No.

21       Q     And do you know who the specific people off the

22  street were?

23             MR. STILLMAN:   What do you mean by off the

24  street?   Their names?

25             MS. SNEED:   I don't know what he means by off

FRANK JOSEPH CARDERELLA JULY 21, 2010

1    the street.  Yes, does he know the identities of the

2    people who he terms as off the street.

3          THE WITNESS:  I guess I was just referring to

4    nongovernment employees coming in with absolutely no

5    experience type of thing.

6        Q    BY MS. SNEED:  And do you know the identities of

7    any of those people who came in with no government

8    experience?

9        A    I don't know their identities, but --

10       Q    You were saying but?

11       A    But there were some that were hired according to

12   what I came to understand later on.

13       Q    And do you know any background information about

14   the GS-5 correctional officers?  And when I say

15   background information, I mean race, national origin,

16   religion, or sex.

17       A    No.

18       Q    What about the people off the street?  Do you

19   know any of their background information, using the same

20   information for background information?

21       A    No.

22       Q    And then the last sentence, looking at the same

23   paragraph on Exhibit 6, says something went wrong

24   somewhere -- I'm sorry, quote:

25          Something went wrong somewhere,

FRANK JOSEPH CARDERELLA JULY 21, 2010

```
 1        Q      BY MS. SNEED:  Let me clarify.

 2               Were there a large number -- were there

 3    Hispanics that were selected for the DEO position that

 4    you applied for?

 5        A      Couldn't tell you how many because they wouldn't

 6    give me the information.

 7        Q      And where did you -- did you ever have -- do you

 8    have any other information that you were not selected for

 9    the position because of your race?

10        A      Any other information?  No.

11        Q      And do you think that you weren't selected for

12    the DEO position because of your national origin?

13        A      I think that's part of it.

14        Q      What do you mean by that?

15        A      I mean, I basically wasn't selected because

16    somebody else filled a spot because of someone that they

17    knew.  Another person was selected over me based on

18    somebody pulling the person in.

19        Q      And was that based on your national origin?

20        A      Could have part to do with it.

21        Q      And what are the other parts?

22        A      What I just said, that because they basically

23    are playing favoritism on who they know and they're

24    pulling in.

25        Q      And who is they?  You said they were playing
```

1   favoritism.

2       A    The people that I mentioned to you before, the

3   upper echelon in Los Angeles at that time.

4       Q    And do you think you were not selected for the

5   DEO position because of your religion?

6       A    I wouldn't know for certain, no.

7       Q    Do you think you were not selected for the DEO

8   position because of your sex?

9       A    No, no, it was not due to my sex.

10      Q    Let me rephrase.  I think that was a double

11  negative.

12      A    Unless they're trying once again to fill quotas

13  that what was rumored at that time, then I'd have to

14  believe, yeah.  But I don't know if females were hired,

15  how many, I don't know.

16      Q    Do you believe that your sex caused you not to

17  be selected for the DEO position?

18      A    No.

19      Q    No, you do not believe that?

20      A    I don't believe it was because of my sex.

21      Q    How were you damaged by the non selection?

22      A    It's affected -- it's pushed my career back;

23  it's affected by retirement.

24      Q    What do you mean by pushed your career back?

25      A    Starting from scratch, by the time -- the time

```
 1              REPORTER'S CERTIFICATE

 2   STATE OF CALIFORNIA      )
                              )  ss.
 3   COUNTY OF LOS ANGELES    )

 4       I, TRULY A. VOSBERG, CSR No. 12656, Certified

 5   Shorthand Reporter for the State of California, do hereby

 6   certify:

 7       That the deponent, FRANK JOSEPH CARDERELLA, named in

 8   the foregoing deposition, prior to being examined, was by

 9   me first duly sworn/affirmed to testify to the truth, the

10   whole truth and nothing but the truth.

11       That said deposition was taken before me at the time

12   and place therein stated and was thereafter transcribed

13   into print under my direction and supervision.  And I

14   hereby further certify that the foregoing deposition is a

15   full, true and correct transcript of my shorthand notes

16   so taken.

17       I further certify that I am not of counsel nor

18   attorney for either of the parties hereto or in any way

19   interested in the event of this case and that I am not

20   related to either of the parties hereto.

21       WITNESS my hand this 23rd day of July, 2010.

22

23

24   _____
     TRULY A. VOSBERG, CSR NO. 12656
25
```

# EXHIBIT B

# WORKFORCE PROFILE SUMMARY
# DEPARTMENT OF JUSTICE - INS
# LOS ANGELES DISTRICT

### Detention and Deportation Branch

### As of 31 March 1997

### All employees are GS-1802 Detention Enforcement Officers

### By Race/National Origin and Sex

| Grade | Caucasian | Black | Hispanic | Asian | Male | Female |
|-------|-----------|-------|----------|-------|------|--------|
| GS-4 | 10 | 2 | 0 | 0 | 10 | 2 |
| GS-5 | 3 | 0 | 2 | 1 | 4 | 2 |
| GS-6 | 2 | 1 | 4 | 0 | 5 | 2 |
| GS-7 | 17 | 14 | 21 | 6 | 56 | 2 |
| **TOTALS** | **32** | **17** | **27** | **7** | **75** | **8** |